**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ELIJAH BAER, ET AL.,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**TESLA MOTORS, INC., A CALIFORNIA CORPORATION, AND DOES 1 THROUGH 10, INCLUSIVE,**<br><br>    Defendants. | **Case No.:** 4:23-cv-02274-YGR<br><br>**ORDER GRANTING IN PART MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 38 |

Plaintiffs Elijah Baer, Joshua Bayangos, Ronald Gruel, Isaiah Hampton, Nathan Johnson, Chandrasekar Kuppuchamy, Derek Lewis, Deserie Martin, Joseph Martinez, Shontae Stephens, Sienna Stephens, Rudy Valdez, Jatel Vercher, and Kayla Williams filed a class action complaint in December 2022 against defendant Tesla Motors, Inc. ("Tesla"), alleging violations of the California Labor Code and Business and Professions Code.[1] Plaintiffs Shontae Stephens and Sienna Stephens specifically were employed by a non-party staffing company and assigned to work at Tesla for a temporary period in 2020. The other plaintiffs represent former and current Tesla employees going back to 2017.

Tesla removed the action to federal court in May 2023. It then filed this Motion to Compel Arbitration of all claims. (Dkt. No. 38, Motion to Compel Arbitration ("Mtn.")) The motion is fully briefed.

Having carefully considered the papers submitted, and for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Compel Arbitration.[2]

---

[1] On August 21, 2023, the Court granted the parties' stipulation dismissing plaintiff Mayreni Morales from the action. Only the fourteen plaintiffs named above remain.

[2] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

**I.      BACKGROUND**

Plaintiffs are twelve past and current employees of Tesla, and two former employees of a nonparty vendor through whom they worked at Tesla for a period of several months. During the course of their relevant employment relationship with the company, plaintiffs were allegedly subject to numerous wage and hour violations in contravention of the California Labor Code and Business and Professions Code. (First Amended Class & Representative Action Complaint ("FAC") ¶¶ 1-3.) Plaintiffs filed their initial class action complaint in Alameda County Superior Court in December 2022, which they amended in February 2023 to include civil penalties under the California Private Attorneys General Act of 2004 ("PAGA"). (*Id.*)

As relevant here, plaintiffs signed various onboarding agreements upon beginning that relationship, which are grouped into three categories.[3]

   i.   *Plaintiffs who Onboarded with the Averture System*

Between the fall of 2018 and May 2022 Tesla relied on recruiting software called Averture. As Tesla describes it, "the Averture system require[d] applicants to create their own secure, personal online profile with their own personal information." (*Id.*) When applicants received an offer of employment from Tesla during this time, Tesla emailed the applicant a link to their offer letter, which was accessible in Averture only via the secured link and a personalized e-signature. (*Id.*) Eight plaintiffs, namely Baer, Bayangos, Gruel, Johnson, Kuppuchamy, Lewis, Martin, and Vercher, all received and signed their offer letters in this manner. (*Id.*)

These plaintiffs signed one singular offer letter containing an arbitration provision, which read, in relevant part:

> [T]o ensure the rapid and economical resolution of disputes that may arise in connection with your employment with Tesla, you and Tesla agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to your employment, or the termination of your employment, will be resolved, to the fullest extent permitted by law by final, binding and confidential arbitration in your city and state of employment conducted by the Judicial Arbitration and Mediation Services/Endispute, Inc. ("JAMS"), or its successors, under the then current rules of JAMS for employment disputes. . . .

---

[3] The parties' motions discuss a fourth agreement signed by Mayreni Morales. The Court takes no view on its contents or enforceability as she is no longer party to the action.

> a. Any claim, dispute, or cause of action between the parties must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding; and
>
> b. The Parties agree that each may file claims against the other only in their individual capacities, and may not file claims as a plaintiff and/or participate as a representative in any representative action against the other, except to the extent this provision is unenforceable under the applicable law. . . .

(*Id.* at 6.) The listed plaintiffs do not dispute that they signed, and Tesla countersigned, the letters. These individuals were also required to sign a non-disclosure agreement as a condition of their employment with Tesla.

> ii. *The Plaintiffs who Onboarded by "Inside Tesla"*

At some point in 2022, Tesla stopped using Averture and instead began relying on an internal system called Inside Tesla. The security measures described above were largely the same for the Inside Tesla system. It appears that with this switch, Tesla also changed its onboarding procedure such that it required new hires to sign both an offer letter and a separate arbitration agreement. Four plaintiffs, namely Martinez, Valdez, Williams, and Hampton, onboarded through this procedure upon being hired.[4]

These plaintiffs' offer letters read, in relevant part:

> To ensure the rapid and economical resolution of disputes that may arise in connection with your employment with Tesla, you and Tesla agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to your employment, or the termination of your employment, will be resolved, to the fullest extent permitted by law by final, binding and private arbitration, in accordance with the terms of Tesla's standard arbitration agreement (enclosed as Schedule 2, titled Mutual Arbitration Agreement).

(*Id*. at 7.) The standalone arbitration agreement, read:

> Tesla and Employee (the "Parties") agree to arbitrate before a neutral arbitrator any and all existing or future disputes or claims between or among them that arise out of

---

[4] Plaintiff Valdez was onboarded through the Averture system but still signed the two separate agreements that the Inside Tesla plaintiffs signed as opposed to the omnibus letter signed by the other Averture plaintiffs. The Court thus analyzes her claims with the Inside Tesla signatories.

3

or relate to Employee's recruitment, employment or separation from employment with Tesla.

(*Id.*) In addition to a clause whereby the parties agreed to "arbitrate all claims covered by this Agreement only as an individual," and waived "any right with respect to any covered claims to submit, initiate, or participate in a class action or collective action, regardless of whether the action is filed in arbitration or in court," the arbitration agreement defined a covered claim as follows:

> [C]laims for non-payment, incorrect or overpayment of wages, commissions, bonuses, severance, employee fringe benefits, stock options, stock grants and the like, failure to pay wages for all hours worked, failure to pay overtime, failure to pay wages due on termination, failure to provide accurate, itemized wage statements, failure to provide breaks, failure to provide required terms and conditions of employment, entitlement to waiting time penalties and/or any other claims involving wages, hours, or conditions of work. . . .

(*Id.* at 7-8.) Finally, the agreement contained a severability clause to the effect that the full agreement "shall not be affected by" a court's refusal to enforce any specific portion of the contract. (*Id.* at 8.)

Notably, at the time the Inside Tesla plaintiffs onboarded, they also signed an agreement titled "Schedule 1," which was Tesla's "TESLA, INC. EMPLOYEE NON-DISCLOSURE AND INVENTIONS ASSIGNMENT AGREEMENT." Schedule I contained two provisions concerning intellectual property rights that plaintiffs contend were unconscionable.

### iii.  *The Two Staffmark Plaintiffs*

Finally, plaintiffs Shontae Stephens and Sienna Stephens were assigned to work at Tesla temporarily in 2020 when they were employees of Staffmark Investment LLC, who is not a party to this suit. According to Tesla, both plaintiffs signed a document before their Tesla assignment began which was called "NON-EMPLOYMENT, NON-DISCLOSURE, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT," and referred to as a "Non-Employee NDA." (*Id.*) In relevant part, the text of the non-employee NDA reads:

> To ensure the rapid and economical resolution of disputes that may arise in connection with your assignment at Tesla, you, Tesla and Supplier agree that any and all disputes, claims, or causes of action, in law or equity, arising from or relating to your assignment, or the end of your assignment at Tesla, will be resolved, to the fullest extent permitted by law by final, binding and confidential arbitration in your city and state of employment conducted by a mutually agreed upon arbitrator. If the

4

> parties cannot mutually agree upon an arbitrator, the arbitration will be conducted through Judicial Arbitration and Mediation Services/Endispute, Inc. ("JAMS"), or its successors, under the then current rules of JAMS for employment disputes . . . .

(*Id.*) The agreement further states that "any claim, dispute, or cause of action must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." (*Id.*)

Both Staffmark plaintiffs submitted declarations to the effect that they never signed the Non-Employee NDA. (Dkt. No. 42-1; Dkt. No. 42-2.) Further, plaintiffs allege that visual differences between the submitted signatures on the Staffmark plaintiffs' declarations and the wet signatures contained in Tesla's retained versions of the Non-Employment NDA leave "no reasonable dispute" that the signatures proffered by Tesla are forgeries.

Tesla moves to compel arbitration pursuant to all agreements the parties purportedly signed as a condition of their employment. Tesla also asks the Court to dismiss plaintiffs' class claims as well as the representative PAGA claims, or alternatively, to stay the representative PAGA actions pending arbitration. Plaintiffs oppose the motion to compel.

## II. LEGAL STANDARD

As a general matter, agreements to arbitrate are valid and enforceable. *See* 9 U.S.C. § 2 (Affirmatively identifying arbitration provisions as "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ."). Additionally, the Supreme Court has affirmed the enforceability of arbitration contracts "affecting commerce," regardless of whether the parties "contemplate[d] an interstate commerce connection." *Allied Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 274, 281 (1995). Furthermore, the Supreme Court has interpreted the Federal Arbitration Act ("FAA") to allow for the invalidation of arbitration provisions "by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)).

## III. DISCUSSION

Plaintiffs make three arguments, each of which are discussed herein.

### A. The Alleged Forgery and Implication of the Doctrine of Unclean Hands

The Court first addresses plaintiffs' contention that Tesla's alleged forgery merits denial of the motion to compel in its entirety on the grounds of unclean hands.

Plaintiffs submit that some of the documents contain signatures that are forged. In support, plaintiffs present a comparison of the two signatures attributed to the Staffmark plaintiffs and the signatures found on the agreements purportedly signed by the Staffmark plaintiffs. Furthermore, Staffmark plaintiffs attest that their onboarding with Tesla occurred a day after the date found on the contracts and as such, they could not have signed them at all.

Tesla responds that it is possible a third party signed the agreements on behalf of the Staffmark plaintiffs, noting that no Tesla employee or representative ever claimed to be "present when these Agreements were executed." (Dkt. No. 43, Reply in Support of Motion to Compel ("Reply") at 5-6.) As such, Tesla believes it cannot be held accountable for wrongdoing when it never claimed to have personal knowledge of the event at issue. At a minimum, Tesla argues that plaintiffs have not made the requisite evidentiary showing by the "clear and convincing" standard necessary in the Ninth Circuit to prevail under the unclean hands doctrine. Tesla further asserts that the question of whether to compel arbitration pursuant to the agreement is one of law, whereas the doctrine of unclean hands is one of equity, and therefore inapposite in this instance.

As an initial matter, the "misconduct which brings the clean hands doctrine into operation must . . . affect the equitable relation between the litigants." *Mattco Forge, Inc. v. Arthur Young & Co.*, 52 Cal. App. 4th 820, 846 (1997) (quoting *Vacco Indus., Inc. v. Van Den Berg,* 5 Cal. App. 4th 34, 52 (1992).

Thus, as applied here, at most, the alleged inequitable behavior by Tesla would impact the agreements relating to the Staffmark plaintiffs, but not those pertaining to the other twelve plaintiffs. *See Hendricks v. AT&T Mobility*, *LLC*, 823 F. Supp. 2d 1015, 1023-24 (N.D. Cal. 2011) (denying a motion opposing compelled arbitration based on unclean hands where the "conduct that Plaintiff complains of has not affected the equitable relations between *these* litigants . . . because none of it happened to Plaintiff.") (emphasis supplied). With respect to the non-Staffmark plaintiffs, the arguments on this ground are denied.

Second, whereas plaintiffs are correct that the unclean hands doctrine can in theory apply to a motion to compel arbitration, *see, e.g.*, *Aanderud v. Superior Court*, 13 Cal. App. 5th 880, 890 (2017) ("A petition to compel arbitration is simply a suit in equity seeking specific performance of a contract."), defendant is correct that plaintiffs' evidentiary burden is to make such a showing by clear and convincing evidence. *See Trafficschool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 833 (9th Cir. 2011) (adopting the clear and convincing evidence standard for applying the unclean hands doctrine). This, plaintiffs have not done. As Tesla notes, it never claimed to have specific knowledge of the circumstances surrounding the Staffmark plaintiffs' adoption of the relevant agreements. While plaintiffs raise questions surrounding the authenticity of the signatures, they have failed to provide the Court with clear and convincing evidence of fraudulent behavior. Electronic signatures are now commonplace and no showing has been made with respect to Staffmark, plaintiffs' own direct employer.  For this reason, the Court denies the motion on the particular grounds of unclean hands as to the two Staffmark plaintiffs.

### B.  Contract Formation

Plaintiffs next raise numerous challenges to the parties' contract formation. The Court addresses each plaintiff group in turn.[5]

#### i.  *The "Inside Tesla" Plaintiffs*

Plaintiffs argue the agreements signed through the Inside Tesla system fail for two reasons: (i) the Musk countersignature is unverified and (ii) two plaintiffs submitted declarations attesting that they never signed the agreements.

##### 1.  *Musk Countersignature*

First, with respect to the issue of Elon Musk's signature, plaintiffs' hyper-technical argument does not persuade.  In *Ambler v. BT Americas Inc.,* a plaintiff who acknowledged signing an arbitration agreement sought to defeat defendant's motion to compel because the agreement was

---

[5] As noted previously, most plaintiffs signed offer letters containing arbitration provisions through the Averture system. These plaintiffs do not contest the validity of the agreements or their applicability to the claims at issue. The Court thus finds that agreements to arbitrate these plaintiffs' claims were validly formed.

7

never countersigned. 964 F. Supp. 2d 1169, 1174 (N.D. Cal. 2013). The court reasoned that defendant had manifested a clear intention to be bound by the arbitration provisions. *Id.* "Having accepted [p]laintiff's signed copy of the Agreement and thereafter accepting [p]laintiff's work for many years, [defendant] would in fact be equitably estopped from arguing it was not bound by the Agreement." *Id.* Thus, the court reasoned the reciprocal must be true and enforced the contract against plaintiff. *See id. See also Chun Ping Turng v. Guaranteed Rate, Inc.,* 371 F. Supp. 3d 610, 623 (N.D. Cal. 2019) (finding the same; *i.e.* in such a situation "the obligation [is] mutual: plaintiff [cannot] get out of the contract because of the absence of defendant's signature.").[6]

All indications lead to the conclusion that Tesla would be bound by the agreement. Not only does it so stipulate in its reply to plaintiffs' opposition, but other courts in this District have held similarly. *See, e.g.*, *Ambler*, 964 F. Supp. 2d at 1174; *see, e.g., Chun Ping Turng*, 371 F. Supp. 3d at 623. Further, the obligation to adhere to the agreement's terms is mutual, regardless of whether the countersignature was personally applied by Musk. *See Ambler*, 964 F. Supp. 2d at 1174; *see Chun Ping Turng*, 371 F. Supp. 3d at 623.

The Court therefore finds that the Inside Tesla agreements do not fail on account of a purported lack of Musk's countersignature.

### 2. *Purported Lack of Signature from Plaintiffs Valdez and Williams*

Plaintiffs Valdez and Williams allege they never entered into a binding arbitration agreement with Tesla, and do not recall receiving or signing such an agreement. Tesla responds with declarations from Ben Flesch, the company's manager of recruiting programs. In those declarations, Flesch describes the onboarding process the company used when it hired plaintiffs Valdez and Williams. (*See* Dkt. No. 38-1, First Declaration of Ben Flesch ("First Flesch Decl."),

---

[6] California courts have expressly held the same when applying state contract law to arbitration agreements. *See, e.g.*, *Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 159 (2015) ("Just as with any written agreement signed by one party, an arbitration agreement can be specifically enforced against the signing party regardless of whether the party seeking enforcement has also signed, provided that the party seeking enforcement has performed or offered to do so. (Civ. Code, § 3388.) [Plaintiff] does not, and cannot, dispute that [defendant] has at all times performed all the duties required of it under the arbitration agreement. In this case, [defendant] has carried its burden in proving the arbitration agreement is a mutually binding agreement.").

8

¶¶ 5-18, 28-32; *see* Dkt. No. 43-1, Second Declaration of Ben Flesch ("Second Flesch Decl."), ¶¶ 4-11.)

Each party cites a California case for support. Plaintiffs rely on *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836 (2014). There, defendant's corporate representative submitted one declaration "summarily" asserting "that Ruiz was the person who electronically signed the . . . agreement . . . but she did not explain how she arrived at that conclusion." *Id.* at 843. A subsequent declaration asserted that company policy required all employees to "log into the company's HR system, using his or her unique login ID and password," but again said nothing about how the defendant arrived at the conclusion that plaintiff's signature was authentic. *Id.* at 844. The court reasoned this "left a critical gap" in the record:

> Indeed, [the declaration] did not explain that an electronic signature in the name of "Ernesto Zamora Ruiz" could only have been placed on the . . . agreement . . . by a person using Ruiz's "unique login ID and password"; that the date and time printed next to the electronic signature indicated the date and time the electronic signature was made; that all . . . employees were required to use their unique login ID and password when they logged into the HR system and signed electronic forms and agreements; and the electronic signature on the . . . agreement was, therefore, apparently made by Ruiz.

*Id.*

Tesla cites *Espejo v. Southern Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047 (2016). There, the court found that defendant's "supplemental . . . declaration offered the critical factual connection that the declarations in *Ruiz* lacked." *Id.* at 1062. The relevant declaration there "detailed [defendant's] security precautions regarding transmission and use of an applicant's unique username and password, as well as the steps an applicant would have to take to" sign the agreement. *Id.* Based on that procedure, the declarant concluded the plaintiff was the only one who could have signed the document. *See id.* This was sufficient to establish, by a preponderance of the evidence, that the signature was authentic. *See id.*

The Court finds that Tesla has similarly met its burden. Flesch's declarations detail security measures the company takes to ensure job applicant privacy, and they connect these measures to his conclusion that the plaintiffs' signatures were authentic. For instance, Flesch states that access to each plaintiff's agreements was sent via a secure link and "was restricted to the applicant," such

9

1  that "other Tesla employees cannot access the applicant's offer letter, except for a small group of
2  administrative employees for the purpose of troubleshooting any technical issues with the link."
3  (First Flesch Decl., ¶ 16.) The declaration also states that the systems specifically show the
4  plaintiffs accessed the letters "by logging into their personal email account and clicking on the
5  secure link" they were sent, before being prompted "to create their own e-signature . . . by either
6  typing their name or drawing their own e-signature." (*Id.*, ¶ 18.) Finally, Flesch declares that the
7  system generated proof of signature upon each applicant completing the signing process. (*See, e.g.*,
8  Second Flesch Decl., ¶ 5.)  Attached as exhibits are audit reports generated by the systems
9  showing: the precise time each applicant signed their offer letters, the IP address from which the
10 letters were signed, and the email address associated with the e-signer. (*See, e.g.*, *id.,* Ex. R.) Thus,
11 the Court finds that Tesla has demonstrated by a preponderance of the evidence that the signatures
12 are authentic.

13                                ii.   *The Staffmark Plaintiffs*

14         As noted above, the Staffmark plaintiffs assert that they never signed the Non-Employee
15 NDA which contained the arbitration provision which Tesla moves to compel. Tesla responds that
16 the NDA's terms were "expressly a condition of employment" and enforceable whether or not the
17 Staffmark Plaintiffs signed. (Reply at 6 (quoting Dkt. No. 42 at 11).)  Further, it asserts that
18 Staffmark, their direct employer, committed the plaintiffs to arbitrate any Tesla-related dispute.

19         Tesla is correct that assent may be inferred if a party is informed that continued employment
20 will constitute acceptance of the arbitration terms. *See, e.g., Craig v. Brown & Root, Inc.,* 84 Cal.
21 App. 4th 416, 420 (2000) ("[A] party's acceptance of an agreement to arbitrate may be . . . implied-
22 in-fact where, as here, the employee's continued employment constitutes her acceptance of an
23 agreement proposed by her employer.")  That said, the record is incomplete.  The parties have not
24 provided the Court with complete copies of the agreement the Staffmark plaintiffs signed. Thus, the
25 Court is unable to determine whether a commitment to arbitrate was such an express condition of
26 employment or agreed upon by the Staffmark plaintiffs' direct employer. Because plaintiffs have
27 raised genuine questions around the purported signature of the NDAs, the Court does not find,
28 based on the record before it, that a valid arbitration agreement existed between these parties. This

10

finding is without prejudice to the submission of further evidence which would answer the Court's questions.

### C. Unconscionability

Plaintiffs next claim that the agreements themselves are so unconscionable as to be unenforceable. They identify two terms found in a separate non-disclosure agreement that the Avature and Inside Tesla plaintiffs were required to sign during onboarding.

Under California law, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Cal. Civ. Code § 1642. Because the NDAs were signed as part of the onboarding process, plaintiffs argue all agreements should be viewed cumulatively as one singular transaction, and therefore one agreement.[7]

Tesla responds that the NDAs constitute separate agreements, such that any possible unconscionability in one does not permeate the other. Additionally, Tesla points to the severability clauses contained in the agreements to note that even were the Court to find the NDA terms unconscionable, the arbitration provisions would survive.

The Court finds that the unconscionability argument is misplaced as the NDAs constitute separate agreements from the offer letters in which the arbitration clause can be found. *First*, as the California Supreme Court has interpreted Section 1642, "[w]hile it is the rule that several contracts relating to the same matters are to be construed together . . . , it does not follow that for all purposes they constitute one contract." *Mountain Air Enters., LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 759 (2017) (quoting *Malmstedt v. Stillwell*, 110 Cal. App. 393, 398 (1930)). *Second*, plaintiffs' authority urging merger of both into one singular agreement, *Lange v. Monster Energy Co.,* 46 Cal. App. 5th 436 (2020), is distinguishable. In that case, the relevant employment agreement expressly

---

[7] Plaintiffs further point to two unpublished California trial court opinions finding the arbitration agreement unconscionable due to the terms referenced by plaintiffs in the instant motion. Plaintiffs argue the doctrine of collateral estoppel prevents Tesla from being able to now relitigate the issue. Tesla correctly notes, however, that whatever precedential value these unpublished trial court opinions may have, motions to compel do not give rise to claims of issue preclusion as they are not final decisions on the merits.

"incorporate[d] all the terms and conditions contained in the" standalone. *Id.* at 449 (internal cites omitted). Here, Tesla's offer letter references the NDA as a condition of employment, but makes no effort to incorporate its terms into the terms of the offer letter itself. (*See* First Flesch Decl., Ex. J.) *Third*, though the agreements were both part of the same onboarding process, they relate to different subject matters: the offer letter concerns general terms of employment, while the NDA is specifically dedicated to protecting defendant's intellectual property. (*See id.*) In cases where California courts have applied Section 1642 to construe distinct agreements as one, the subject matter of those agreements largely overlapped in a way the two contracts do not here. *See, e.g., Alberto v. Cambrian Homecare,* 91 Cal. App. 5th 482, 490-91 (2023) (construing an arbitration and a confidentiality agreement together when they "were executed on the same day . . . [,] were both separate aspects of a single primary transaction . . . [, and] both governed, ultimately, the same issue – how to resolve disputes arising between" the parties).

Because the Court finds the terms of the NDA do not impact the unconscionability of the relevant arbitration agreements, the motion on this ground is denied.

### D.  Dismissal of Class Claims

Tesla next asks this Court to dismiss plaintiffs' class claims because the arbitration agreements contain a class waiver. Tesla notes, and plaintiffs do not contest, that "[t]he Supreme Court's recent decision in *Epic Systems* reinforced that such class action waivers, even in employment arbitration agreements, are enforceable." (Mtn. at 18.) The plain language of all three relevant agreements waives plaintiffs' ability to pursue any representative claim. The Court will thus dismiss the class claims, but not the representative PAGA claims. *See infra,* Part III.E.

### E.  Plaintiffs' PAGA Claims

Finally, the parties dispute the proper course with regard to the PAGA claims. Tesla asserts that the Court should dismiss plaintiffs' representative PAGA claims or, in the alternative, stay them. Plaintiffs disagree.

1.  *Dismissal of plaintiffs' representative PAGA claims*

1  PAGA established a vehicle through which individual "aggrieved employees"[8] have
2  standing to pursue civil penalties from employers who violate the labor code. *Adolph v. Uber*
3  *Techs., Inc.*, 14 Cal. 5th 1104, 1116-17 (2023). As envisioned by the statute, such litigants act as
4  agents of the state in bringing a "type of *qui tam* action" in which the state is a real party in interest
5  in the matter. *Johnson v. Lowes Home Ctr., LLC*, 93 F.4th 459, 463 (9th Cir. 2024). Under PAGA,
6  aggrieved employees may file claims for injuries personally suffered (an "individual PAGA claim")
7  or on behalf of the state in a representative capacity for violations affecting a broader class of
8  aggrieved employees ("representative" or "non-individual PAGA claims"). *Id.*

9  In *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348 (2014), the California
10 Supreme Court held that agreements waiving representative PAGA standing were void as against
11 public policy. The United States Supreme Court then interpreted *Iskanian* to mean that agreements
12 to bifurcate PAGA actions into arbitrable individual claims and litigable representative claims were
13 invalid as well. *Viking River Cruises, Inc. v. Moriana,* 596 U.S. 639, 662 (2022). Given PAGA's
14 prohibition on waiving representative standing, such a "mandatory joinder" rule would in effect
15 also work a prohibition on the right to bring individual PAGA claims. *See id.* As parties have a
16 right under the FAA to consent to arbitration, the Supreme Court held such a prohibition was
17 preempted by the FAA and, as a result, struck down the mandatory joinder rule. *Id.* Going farther,
18 however, the Supreme Court read PAGA to mean that employees subject to mandatory arbitration
19 of their individual claims had no legislative standing to pursue representative PAGA actions. *Id.* at
20 663. The California Supreme Court corrected that interpretation in *Adolph v. Uber Techs., Inc.*,
21 holding that aggrieved employees may bring representative PAGA actions even where their own
22 injuries are subject to arbitration. 14 Cal. 5th at 1123.

23 After *Adolph*, the parties continued to dispute the application of the rule. The Ninth Circuit
24 decisively answered this question in *Johnson v. Lowe's Home Ctrs.*, 93 F.4th 459 (2024). "It is
25 axiomatic," the court noted, "that a state court has the authority to correct a misinterpretation of that
26 state's law by a federal court." *Id.* at 464. As such, and since "[t]here is nothing in *Adolph* that is

---

[8] For purposes of the statute, the Labor Code defines an aggrieved employee as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

13

inconsistent with the federal law articulated in *Viking River*," the Ninth Circuit left undisturbed the California Supreme Court's holding that "PAGA prevented the plaintiff from waiving his right to pursue his non-individual PAGA claims in court." *Id.* at 465.

*Johnson* controls. While plaintiffs can be forced to arbitrate their individual claims, they do not lose the right to pursue their representative PAGA actions. The Court will therefore not dismiss plaintiffs' representative PAGA actions.

### 2. *Stay of plaintiffs' representative PAGA claims*

Thus, without dismissal, the final question concerns the issue of a stay. The *Adolph* court clarified that a stay may not be strictly required, but would be a practical means of ensuring PAGA plaintiffs are aggrieved employees within the meaning of the statute. *Adolph,* 14 Cal. 5th at 1123-24 (a "trial court may exercise its discretion to stay the non-individual claims pending the outcome of the arbitration" and depending on the outcome, may ultimately conclude that a plaintiff "could no longer prosecute his non-individual claims due to lack of standing."). The Court agrees and finds this to be the most efficient resolution to the question. Plaintiffs' individual PAGA claims are stayed pending the outcome of arbitration of their individual claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to compel arbitration.

The motion is **GRANTED** with respect to plaintiffs Gruel, Lewis, Johnson, Martin, Kuppuchamy, Vercher, Baer, Bayangos, Valdez, Williams, Hampton, and Martinez. The Court **STAYS** these plaintiffs' representative PAGA claims pending the outcome of arbitration.

The motion is **DENIED WITHOUT PREJUDICE** with respect to plaintiffs Shontae and Sienna Stephens. Within twenty-eight days of this order, Tesla may submit a motion with additional evidence addressing the issues identified herein, if such evidence exists. Neither party may re-argue a ground which has been decided herein or assert a new argument which could have been asserted in the first instance. If a motion is not filed, the issue will be deemed waived, and the plaintiffs shall contact the courtroom deputy to set a case management conference.

The Court **DISMISSES** all class claims.

This terminates Docket No.38

**IT IS SO ORDERED**.

Date: June 10, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**